# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-3124-19
A-3357-19

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

D.L. and T.Z.,

      Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF T.Z., JR.,
and A.Z., minors.

_____

        Argued June 30, 2021 – Decided September 2, 2021

        Before Judges Accurso and DeAlmeida.

        On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket No. FG-13-0066-18.

Michael Confusione argued the cause for appellant T.Z. in A-3124-19 (Hegge & Confusione, LLC, attorneys; Michael Confusione, of counsel and on the brief).

Richard Foster, Assistant Deputy Public Defender, argued the cause for appellant D.L. in A-3357-19 (Joseph E. Krakora, Public Defender, attorney; Richard Foster, of counsel and on the brief; Ilea Anne Kozak, Designated Counsel, on the brief).

Meaghan Goulding, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jane C. Schuster, Assistant Attorney General, of counsel; Meaghan Goulding, on the briefs).

Randi Mandelbaum, Designated Counsel, argued the cause for minors (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Randi Mandelbaum, on the briefs).

PER CURIAM

In these consolidated cases, defendants D.L. (Mother) and T.Z. (Father) appeal from a final judgment terminating their parental rights to their six-year-old son, T.Z., Jr., and five-year-old daughter, A.Z. Mother contends the Division of Child Protection and Permanency failed to prove even one of the four prongs of the best interests standard of N.J.S.A. 30:4C-15.1(a)(1)-(4) by clear and convincing evidence. Father argues the Division failed to prove the first two prongs, that the children's safety, health or development were endangered by his parental relationship and that he is unwilling or unable to

eliminate that harm or provide a safe and stable home for them, as well as the fourth prong, that terminating his rights to the children will not do more harm than good.

The Law Guardian joins with the Division in urging we affirm the judgment. Having considered defendants' arguments in light of the record and controlling law, we affirm the termination of their parental rights, substantially for the reasons expressed by Judge Terence P. Flynn in his thorough and thoughtful opinion from the bench on March 23, 2020.

The facts are fully set forth in Judge Flynn's meticulously detailed opinion, and need not be repeated here. Suffice it to say that defendants were already enmeshed in a long-term volatile and sometimes violent relationship before either of these children were born. The Division received three referrals during Mother's pregnancy with T.Z., Jr. about domestic violence incidents between the two witnessed by Mother's then seven-year-old daughter.[1] The couple also got into a verbal altercation in the hospital at the time of T.Z., Jr.'s birth, leading to implementation of a safety plan. Because they didn't have stable

---

[1] That child is not a part of this appeal. The Division obtained care and custody of Mother's older child, a daughter, in September 2015. Legal and primary residential custody was transferred to the child's father a few months later, but Mother has parenting time, and her relationship with that daughter figured into some of the evaluations.

housing, Mother and Father placed T.Z., Jr. with Father's aunt shortly after the baby's birth. But after two more domestic violence referrals, both of which occurred while one of the parents was holding the baby, the Division sought custody of T.Z., Jr. and formally placed him with his great aunt when he was about six months old.

A.Z. was born about four months later near the end of March 2016. Mother and child were discharged the same day, and the following month the Division returned T.Z., Jr. to defendants. But the domestic violence did not stop. Just three weeks later, Father allegedly attacked Mother with a knife of some sort and threw her against a wall. Mother obtained another domestic violence restraining order, and Father was charged with assault. He spent two months in jail.

That assault charge was dismissed on the condition that Father have no contact with Mother or the children. He violated that order by having regular contact with both — although Mother and Father denied it to the Division. That conduct led the Division to request custody of the children, which the court ordered in August 2016. The Division placed both children with Father's aunt, where they remain.

Judge Flynn described several more domestic violence incidents over the following two years. Although the parties disagreed about which of them had been the aggressor in some of the incidents between them, there is no dispute that both received injuries at various times, that they secured, and then dismissed, several domestic violence restraining orders, and that Father spent the two months in jail on the one assault charge (which was dismissed on the no-contact condition), and pleaded guilty to another, for aggravated assault, and was sentenced to a year's probation. Mother was also arrested for assaulting Father on at least one occasion. In December 2017, after a myriad of different services offered both Mother and Father, some taken advantage of and others not, and mounting evidence that neither would comply with court orders and do what was necessary to regain custody of their children, the Division changed its permanency goal to termination of parental rights.

At trial, two mental health experts, one offered by the Division (Dr. Brandwein) and the other by the law guardian (Dr. Santina), both of whom relied on prior evaluations by Dr. Landry, testified to Mother's low intellectual functioning, her lack of understanding of children's development and lack of empathy for their limitations and needs, her inflexible attitude, inability to

accept responsibility for her actions and her tendency to blame others for her problems.

Dr. Brandwein also testified Mother suffered from a personality disorder with paranoid and obsessive-compulsive features. He found those personality traits and problems reflected in her suspiciousness of the Division, Father's aunt and her own mother, with whom she lived from time to time throughout these proceedings. He also saw those same traits reflected in the Division's therapeutic visitation reports, which documented Mother's rigid parenting style, unrealistic expectations for the children's behavior and over-reactions to situations involving the children and her resistance to any suggestions for their care.

Most concerning for Dr. Brandwein was that Mother lied to him about her continuing involvement with Father, leading the expert to conclude she had gained nothing from four years of services, and that reunification would only increase the risk that the children would again be exposed to domestic violence. The law guardian's expert agreed.

The experts also agreed about Father's limitations and unwillingness to engage in services. Dr. Brandwein diagnosed Father as suffering from post-traumatic stress syndrome as a result of a house fire when he was twelve, major

6

depressive disorder with psychotic features, borderline intellectual functioning and severe alcohol use that Father reported, without any corroborative evidence, was in remission. Father broke down and sobbed in court when Dr. Brandwein described Father's history and his challenges. Dr. Santina diagnosed Father with bipolar disorder with anger outbursts, post-traumatic stress disorder, depression with psychotic features, attention deficit hyperactivity disorder and severe alcohol use disorder. Both experts agreed that due to Father's unresolved alcohol abuse, failure to attend an intensive out-patient program geared to addressing that abuse, inconsistent compliance with therapy and medication management, and inability to recognize and take responsibility for his part in the couple's on-going domestic violence, that he could not parent the children now or in the foreseeable future.

Both experts concluded the children were bonded to their parents as well as to Father's aunt and her husband, who had cared for the children for all but about five months of their lives. They agreed, however, the children's bond with the resource parents was likely stronger, that the children would not suffer any enduring harm from termination, and, importantly, that the resource parents would be able to mitigate any harm that occurred. Neither expert believed that either Mother or Father could mitigate the harm flowing from severing the

7

children's relationship with their resource parents, and Dr. Brandwein doubted that Mother would even be able to recognize and accept the grief the children would likely feel on separating from them.

Several other witnesses testified. Father's aunt testified about her relationship with the children and their parents. She claimed she maintained a civil relationship with Father for the most part, but had stopped supervising Mother's visitation with the children after being the target of her several false allegations regarding their care. She also testified the Division had explained to her the option of kinship legal guardianship, which she rejected in favor of adoption, believing it would provide the children greater stability.

Mother also called her parent mentor and therapeutic visitation supervisor, the latter who notably did not support reunification, testifying that Mother had failed to meet her therapeutic goals and often blamed the children and had difficulty identifying with their emotional needs. She also testified that Mother repeatedly yelled at her older child, a pattern the witness feared would repeat with these children as they matured, and expressed anger and negative feelings toward the resource parent. Mother also called her individual therapist, who testified to her progress in therapy but could not offer an opinion on her ability to parent, having never observed her with the children.

8

Father testified in his own behalf. Although he had previously acknowledged not being able to care for the children and expressed his desire that they be placed with his aunt, at trial he testified he was ready to assume their care. He presented no actual plan for doing so, however, and acknowledged he had refused to attend intensive outpatient treatment and had been arrested for driving under the influence during the pendency of the proceedings. Father, who was living with his grandparents and proposed having the children move in with him there, also acknowledged he'd been arrested for simple assault on his grandfather in April 2019.

After a six-day trial occurring over several months, Judge Flynn concluded the Division proved all four prongs of the best interests standard by clear and convincing evidence as to both parents. Addressing the first prong, he noted the "case has always been, for the most part, a matter of risk of harm." That risk is two-fold. First is the risk to the children from their parents' psychological and intellectual deficits. Second is the likely harm they would suffer from being exposed to future domestic violence between their parents.

The judge also found, however, that both parents have actually inflicted harm on these children. Although expressing no doubt about Mother's and Father's love for the children, the judge found that each had harmed both

9

children by being "out of [their] lives for all but five months of the last four years. . . . as a direct result of the parents' failure to address the issues which have thus far precluded reunification. . . . [w]hether it's continued domestic violence in a consistently toxic relationship or failure to address their mental health issues."

As to the second prong, the parent's unwillingness or inability to eliminate the harm, the judge found neither parent had "any realistic plan for changing the situation." Acknowledging that "[e]ach has suffered deep and tragic damage from their own life's history," that both are "cognitively challenged," and that "[e]ach has also deep mental concerns," the court found it clear, in one sense, "that in all likelihood they couldn't change even if they wanted to." See N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 614-15 (1986) (noting the difficulty in determining "how much the inability of the parents to transfer affection or care to their children may be attributed to the parents' being short-changed by either nature or society").

The judge found Mother "continues to show intense reaction to even the slightest amount of stress," becoming "unglued mentally and emotionally" and "virtually incoherent." As for Father, "he's still hearing and following voices, still inconsistent with his medications," and can't even list those he's taking. The

judge also found "Father is still interested in control with the Mother," and stated he could "only imagine the chaotic world in which a child in this relationship would be forced to endure." He found the persistence of defendants' parenting deficiencies after their failed attempt at reunification, their unwillingness to fully engage in the services they needed, and their minimization of their own problems, and in the case of the Mother, casting blame on the Division for those problems, demonstrated their unwillingness to recognize or eliminate the harm they had inflicted.

Finally as to the second prong, Judge Flynn noted that "past behavior is probably the best predictor of future conduct," emphasizing that "the parents have continued their relationship" for almost six years. The judge said he had "no doubt, especially when [he] has seen how [the] parents will go to any length to cover up their relationship and would only admit so when they were found out, that they would fall into the same patterns should the children be returned to their care." The judge found "[a]s to the continued harm, it's clear that the caregivers would always be there for the children. . . . as they have been there for most of their lives."

The judge found the Division made extraordinary efforts to try and bring Mother and Father to the point where they could parent their children,

11

"behav[ing] consistently, as optimistically as [it] could." Considering those third prong efforts, Judge Flynn found "this is not a case of the failure of the Division to provide services" but of the failure of the parents "to benefit from services" the Division provided. Addressing, in particular, visitation, the judge said:

> In hindsight, one could look back and wonder why, at times, the Division and at other times, the Court, was so willing to extend liberal and often unsupervised visitation to these parents. In fact, at one point on the birth of the second child, as I've noted, we even reunified the parents with the children. To be sure, early psychological evaluations provided by Dr. Landry and even Dr. Brandwein at the end of his first evaluation, were recommending that we work toward reunification. All this reflected an optimism which was not really justified, unfortunately, especially given the DV history of the case.

The judge also found there were no alternatives to termination, noting Father's aunt was questioned specifically about kinship legal guardianship on the record and unambiguously expressed her desire to adopt the children. The judge termed her decision "informed and unequivocal."

Finally, the judge expressed no hesitation in finding that terminating Mother's and Father's rights will not do more harm than good. The judge noted the expert testimony in that regard was unrebutted. While finding the children bonded to their parents, the experts testified that breaking that bond would not

cause them serious and enduring harm, and whatever harm they did suffer could be assuaged by their great aunt and uncle. "On the other hand," the judge concluded "there is a genuine risk of harm to the children" were they reunited with their parents and "required to live in an atmosphere of general unpredictability and impulsive behavior."

Judge Flynn concluded it was clear the children looked to their great aunt and uncle "for the nurture and security and stability that they will need going forward," and that there was "overwhelming good in this case in the prospect that the children will be able to grow to adulthood in a home that is stable and nurturing and free from the chaos and uncertainty which the parents likely in the future would be able to provide." Although deeming it "unfortunate" that Mother and Father have only that chaos and uncertainty to offer these two children, the judge made clear he did not find either "malicious or violent" with regard to them, concluding only that "their relationship with each other and their own limitations emotionally and psychologically" made termination "imperative."

Our review of a trial court's decision to terminate parental rights is limited. N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448-49 (2012). We generally "defer to the factual findings of the trial court because it has the

opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 293 (2007)).

Our review of this record convinces us the judge's findings are amply supported by the trial testimony and the many records of the Division's interaction with this family admitted in evidence. Mother contends the judge erred in finding the children were harmed or at risk of harm from the domestic violence between her and Father; that the evidence at trial established she had permanently ended her relationship with Father; that she made "significant and consistent progress in resolving her mental health issues through therapy"; and that the Division failed to provide her assistance to secure her own place to live and to continue her therapeutic visitation. She also argues the judge overlooked her "significant progress in therapy" after completion of the expert reports and that evidence, coupled "with her strong bond with her children, establishes that terminating her parental rights would do more harm than good."

Father argues there was no clear and convincing evidence that the children's health and development "were and would continue to be endangered"

by a parental relationship with him; that he was unwilling or unable to eliminate any alleged harm; and that the Division failed to prove that terminating his parental rights would not do more harm than good. He also argues the judge improperly rejected the alternative of kinship legal guardianship as to him.

All of defendants' arguments, including Father's argument that the judge improperly concluded his aunt was well informed about her option for kinship legal guardianship, reduce to quarrels with the judge's fact-finding which we are simply in no position to reject. See F.M., 211 N.J. at 448-49 (explaining "[i]t is not our place to second-guess or substitute our judgment for that of the family court," when "the record contains substantial and credible evidence to support the decision to terminate parental rights"). Both parents re-argue the same points they made in the trial court.[2] Judge Flynn addressed and rejected each

---

[2] Mother's motion to supplement the record with documents reflecting her post-judgment therapy, visitation and an apartment lease continues that effort. Having reviewed all of those documents, we can confidently say that none undermines or impugns any of the judge's well-considered findings or demonstrates that she has become a fit parent. In other words, they would not have affected the outcome. See Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A., 189 N.J. 436, 453 (2007) (denying motion to supplement the record on appeal with documents unlikely to have affected the outcome of summary judgment in the trial court). Accordingly, we deny her motion to supplement the record.

one for reasons he carefully explained in an opinion spread on the record in an eighty-five page transcript.

Judge Flynn's factual findings and credibility determinations were thorough, and his legal analysis is sound. We accordingly affirm the termination of defendants' parental rights, substantially for the reasons expressed in the judge's careful and well-reasoned opinion from the bench.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION